# UNITED STATES DISTRICT COURT DISTRICT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Eric Will, as representatives of a<br>class of similarly situated persons<br>and on behalf of the General<br>Dynamics Corp. Hourly Savings and<br>Stock Investment Plan, and Richard,<br>Cotterman, Daniel Kuczon, and James<br>Barnes, as representatives of a class<br>of similarly situation persons and on<br>behalf of the General Dynamics Corp.<br>Savings and Stock Investment Plan, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | Cause No: 06-698-WDS |
| Plaintiffs; | )<br>)<br>) | |
| v. | )<br>) | **JURY TRIAL** |
| | ) | **DEMANDED ON ALL** |
| General Dynamics Corporation,<br>and John W. Schwartz, | )<br>) | **COUNTS AND ISSUES SO**<br>**TRIABLE** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR BREACH OF FIDUCIARY DUTY

### INTRODUCTION

1.      Personal savings accounts, such as 401(k)s, are quickly becoming employees'
primary method of financially planning for retirement.  An increasing number of companies
recently have announced the termination of traditional defined benefit pension plans and their
replacement by defined contribution 401(k) plans.  For many employees in the United States
today, an employer-provided defined benefit pension awaiting their retirement is a quaint,
historical notion.

2.      In 401(k) plans, employers provide an opportunity for employees to save their
own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment

alternatives into which employees place a portion of their current income with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical. Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses.  Indeed, federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor."  The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry.  ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants.  At worst, they are excessive, undisclosed, and illegal.

10.      In this action,  pursuant to ERISA § 502(a),  29 U.S.C. § 1132(a), Plaintiffs and Class Representatives Eric Will on behalf of the General Dynamics Corporation Hourly Savings and Stock Investment Plan (the "Hourly Plan") and Plaintiffs and Class Representatives Richard Cotterman, Joann Miller, and James Barnes on behalf of the General Dynamics Corporation Savings and Stock Investment Plan (the "Salaried Plan") (collectively the "Plans") and similarly situated participants and beneficiaries in the Plans, seek to recover the losses suffered by the Plans and to obtain injunctive and other equitable relief for the Plans from General Dynamics Corporation ("General Dynamics"), the Plan Sponsor and the Plan Administrator for both Plans, and other defendants identified below based upon breaches of their fiduciary duties (collectively "Defendants").

11.      As set forth in detail below, the two Plans are combined into the General Dynamics Savings and Stock Investment Plans Master Trust ("Master Trust").  The fees and expenses are paid by the Master Trust and then allocated to one of the two participating Plans, and thus borne by participants in both Plans.  The fees and expenses charged are unreasonable and excessive, not incurred solely for the benefit of the Plans and their participants, and undisclosed to participants.  By subjecting the Plans and their participants to these excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA.

**PARTIES, JURISIDCTION, AND VENUE**

**Plaintiffs**

12.     Plaintiff and Class Representative Eric Will is a resident of Marion, Illinois.  Mr. Will is a participant in the Hourly Plan.

13.     Plaintiff and Class Representative Richard Cotterman is a resident of Virden, Illinois.  Mr. Cotterman is a participant in the Salaried Plan.

14.     Plaintiff and Class Representative Daniel Kuczon is a resident of San Diego, California.  Mr. Kuczon is a participant in the Salaried Plan.

15.     Plaintiff and Class Representative James Barnes is a resident of Nixa, Missouri.  Mr. Barnes is a participant in the Salaried Plan.

## Defendants

16.     Defendant General Dynamics is a Delaware registered corporation with its headquarters in Falls Church, Virginia and employs more than 81,000 people worldwide.

17.     General Dynamics has five primary business units: aerospace, combat systems, information systems and technology, marine systems, and Freeman Energy, which operates three coal mines in southern Illinois.

18.     General Dynamics is the Sponsor of both Plans pursuant to ERISA § 3(16)(B).

19.     Defendant General Dynamics is also the named fiduciary and Administrator of both Plans.

20.     Defendant John W. Schwartz, Vice President and Controller, is the individual designated by General Dynamics to sign documents as the Plan Administrator.

## Jurisdiction and Venue

21.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), which provides that participants may pursue civil actions on behalf of the plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109,  and to

obtain other appropriate equitable relief.  This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132(e)(1)(2).

22.     All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C. § 1132(e)(1).

23.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because the Defendants may be found in this district in that General Dynamics has three mines located within the Southern District of Illinois and because Plaintiff and Class Representative Eric Will reside in this district, participated in the Plan from this district, received statements, Plan summaries, and other information from the Defendants in this district and suffered damages in this district.

## Class Certification Under Rule 23

24.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all similarly situated participants and beneficiaries of both Plans.  They seek to represent the following Class (the "Class"):

> All persons, *excluding the Defendants, and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are/or were participants or beneficiaries of the Salaried Plan or the Hourly Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of either Plan in the future.

25.     Certification of this Class is proper under Rule 23(a) in that:

A. **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the publicly available documents state that, at the end of the 2004, there were 47,647 participants with account balances in the Salaried Plan and 17,644 participants with account balances in the Hourly Plan.

B. **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members.  Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

    i.   Charged fees and expenses to the Master Trust and/or that are unreasonable or not incurred solely for the benefit of participants;

    ii.   Caused the Plans and/or the Master Trust to enter into agreements with third-parties that caused or allowed the fees and expenses that are unreasonable or not incurred solely for the benefit of participants;

    iii.   Failed to monitor the fees and expenses paid by the Master Trust and/or the Plans, by such failure, caused or allowed the Master Trust and/or the Plans to pay fees and expenses that are unreasonable or not incurred solely for the benefit of participants;

    iv.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

    v.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Master Trust and/or the Plans were reasonable and incurred solely for the benefit of participants;

    vi.   Failed properly to inform, and disclose to, participants the fees and expenses that are, or have been, paid by the Master Trust and/or the Plans;

vii.   Failed to inform, and disclose to, participants in proper detail and clarity the transaction fees and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

viii.  Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against the Plans' assets held in the Master Trust and by failing to stop such hidden excessive fees;

ix.    In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Master Trust and/or the Plans, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

x.     Caused or allowed fees and expenses to be paid by the Master Trust and/or the Plans for purposes other than those allowed by ERISA;

xi.    By the conduct above and by other conduct set forth in this Complaint, revealed in discovery and proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plans, Plan participants and beneficiaries, and members of the Class;

xii.   Are liable to the Plans and the Class for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations; and

xiii.  Are responsible to account for the assets and transactions of the Plans and should be charged for any transactions and payments for which they cannot account.

C. **Typicality.**  The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

    i.  The Defendants owed the exact same fiduciary and other ERISA-based obligations to each participant in both Plans, each beneficiary, and each member of the Class;

    ii.  The Defendants' breach of those obligations constitutes a breach to each Plan participant, beneficiary, and member of the Class;

    iii.  To the extent that there are any differences in Class members' damages, such differences would be a product of simple mathematics based upon his or her account balance in the Plans. Such minimal and formulaic differences are no impediment to class certification.

D. **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent Class members and will protect such absent Class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

26.  Class certification is also appropriate under Rule 23(b) and each subpart in that:

A.  Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

### FACTS APPLICABLE TO ALL COUNTS

### The Plans

27.     As part of their compensation and benefits, General Dynamics offers certain of its employees the opportunity to participate in either the Salaried or the Hourly Plan.  Both Plans are "defined contribution plans," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contain or are part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  The Plans are also tax-qualified plans of the type popularly known as a "401(k) plans."

28.     General Dynamics benefits by providing the Plans to eligible employees in that the opportunity to participate enhances General Dynamics' ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles General Dynamics to tax advantages under the Internal Revenue Code.

29.     Each Plan was established and is operated under a Plan Document.  The assets of both Plans are combined into a single trust fund known as the General Dynamics Corporation Savings & Stock Investment Plans Master Trust ("Master Trust").

30.     The Master Trust Agreement is part of, and incorporated into, the Plan Document for each Plan.

31.     There is one Summary Plan Description ("SPD") that is distributed to participants in both Plans in addition to supplements that address any particular terms of a participant's individual Plan terms.

32.     Generally, a "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to a 401(k) plan or plans.  Plan sponsors and administrators generally utilize master trusts to administer multiple 401(k) plans for an employer or related-employer group (*e.g.* a company or related companies that maintain salaried and an hourly employee plans; plans formerly sponsored or administered by a company which the employer has acquired or with whom the employer has merged; plans which include only employees of a bargaining unit or represented by a labor organization, etc.).

33.     The Master Trust enables both Plans to access common investment options or funds and to share the services of Master Trust record-keepers, investment managers, consultants, and other service providers.  The fees incurred for such services are allocated between the Plans based upon each Plan's proportionate share of the assets in the Master Trust.

34.     In 2004, the Salaried Plan's assets comprise approximately 85.1% of the assets in the Master Trust.  The Hourly Plan's assets, thus, comprise approximately 14.9% of the assets in the Master Trust.

35.     According to the SPD, the purposes of the Plans are to encourage employee savings by furnishing them with an incentive to save for the future and to give them an opportunity to become more interested in Company affairs through investing in the General Dynamics Stock Fund.

36.     According to the SPD, General Dynamics matches a portion of the money contributed by participants; the amount of the match may differ depending on a participant's position within the company.

37.     According to the SPD, participants accounts are credited with their own contributions (both before and after tax), the employer match, any rollover contributions from previous savings plans, and finally, income earned by participants' investment choices.

38.     According to the SPD, participants may direct their contributions in one or more of the following investment fund options: Fixed Income Fund, Bond Index Fund, Balanced Fund, S&P 500 Stock Index Fund, Small Cap Index Fund, General Dynamics Stock Fund, Large Cap Growth Fund, and Large Cap Value Fund.

39.     According to the SPD, all fees and expenses incurred in administering the Plans are paid by the Master Trust and then allocated to each Plan and participants' accounts.  The SPD does not describe the formula or method by which the expenses are allocated; it merely states that they are allocated at the discretion of General Dynamics and are reflected as an adjustment to investment earnings.

40.     According to the SPD, General Dynamics reserves the right to terminate the Plans at any time and for any reason.

41.     General Dynamics indemnifies each officer, director, and employee of the Company who has been designated to carry out any fiduciary or administrative responsibility.

### Defendants' Fiduciary Duties To The Plans Under ERISA

42.      ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan

and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

43.     ERISA §§ 404(a)(1)(A)&(B), 29 U.S.C. § 1104(a)(1)(A) & (B), requires that Plan fiduciaries, including Defendants, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

     A.     [F]or the exclusive purpose of:

         i.     providing benefits to participants and their beneficiaries; and

         ii.     defraying reasonable expenses of administering the plan;" and

     B.     [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

44.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plans and "parties in interest."  Unless subject to an exemption set forth in ERISA § 408, 29 U.S.C. §1108, a fiduciary

     shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

45.     For purposes of section 406, a "party in interest" is any Plan fiduciary, including the Plan Administrator, trustee, officer or custodian, any Plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

46.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account;" (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

47.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to participants and beneficiaries a Summary Plan Description.

48.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

49.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

> A. [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and

    B.  [A] statement of receipts and disbursements during the preceding twelve-

        month period aggregated by general sources and applications.

    *See* ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

50.    ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and

beneficiaries to receive more detailed information from the Plan Administrator on request:

    The administrator shall, upon written request of any participant or beneficiary,

    furnish a copy of the latest updated summary, plan description, and the latest

    annual report, any terminal report, the bargaining agreement, trust agreement,

    contract, or other instruments under which the plan is established or operated.

51.    ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among other

extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report":

    a statement of [the Plan's] assets and liabilities, and a statement of changes in net

    assets available for plan benefits which shall include details of revenues and

    expenses and other changes aggregated by general source and application.

52.    ERISA § 404(c), 29 U.S.C. §1104(c),  provides to Plan fiduciaries a "safe harbor"

from liability for losses that a participant suffers in his or her 401(k) account to the extent that

the participant exercises control over the assets in his or her 401(k) accounts.  To be eligible for

the protection of this "safe harbor," Plan fiduciaries must, among other things, provide:

    A.    "an opportunity for a participant or beneficiary to exercise control over

    assets in his individual account," and

    B.    "a participant or beneficiary with an opportunity to choose, from a broad

    range of investment alternatives, the manner in which some or all of the assets in

    his account are invested."

29 C.F.R. §2550.404c-1(b)(1).

53.     For a participant or beneficiary to have "an opportunity to exercise control over assets in his account," Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the [P]lan." 29 C.F.R. §2550.404c-1(b)(2)*(:)(B)*.

54.     The "sufficient investment information" Plan fiduciaries must provide includes:

> A.     "A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)." 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*; and

> B.     At least upon request, "[a] description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative." 29 C.F.R. §2550.404c-1(b)(2)(i)(B) *(2)(i)*.

55.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as *Plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are*

*established under the plan to periodically inform such participants and*

*beneficiaries of actual expenses incurred with respect to their respective*

*individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

### The Fees and Expenses Assessed Against The Plans

56.     Either directly or through the Master Trust, Defendants have caused each Plan to purchase trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services from various institutions and entities.

57.     Either directly or through the Master Trust, Defendants have caused the amounts that each Plan pays for these services to be assessed against participants' accounts.

58.     Either directly or through the Master Trust, Defendants have caused or allowed these services providers to receive payment in at least one of two ways:

    A.  By direct disbursement from the Plans to the entity providing the service; or

    B.  By receiving, or having the opportunity to receive, "Revenue Sharing" payments comprised of Plan assets distributed between or among various service providers.

### "Hard Dollar" Payments to Plan Service Providers

59.     Payments in the form of direct disbursements from the Plans to participants or an entity providing a service to the Plans are characterized as "Hard Dollar" payments.

60.     The Plans disclosed to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plans to service providers.  For example, the Hourly Plan disclosed in filings with government regulators that it paid $791,735 to Hewitt and

$7,504 to CitiStreet Retirement Investment, the Plan's record-keepers in 2004.  The Salaried

Plan disclosed in filings with government regulators that it paid $4,530,472 to Hewitt and

$42,920 to CitiStreet Retirement Investment, the Plan's record-keepers in 2004.

61.     Based upon this disclosure, understanding the Plans' record-keeping expenses for

2004 *appears* straightforward:  The Hourly Plan sent a check for over $799,239 and, in exchange,

Hewitt and CitiStreet Retirement Investment maintained the Hourly Plan's records.  The Salaried

Plan sent a check for 44,573,392 and, in exchange, Hewitt and CitiStreet Retirement Investment

maintained the Salaried Plan's records.

### Revenue Sharing Payments to Service Providers

62.     Revenue Sharing is a common practice in the financial, securities, and investment

industry that provides services to 401(k) plans.

63.     Industry commentators and analysts consider Revenue Sharing as the "big secret

of the retirement industry."

64.     Industry commentators and analysts generally define Revenue Sharing as the

transfer of asset-based compensation from brokers or investment management providers (such as

mutual funds, common collective trusts, insurance companies offering general insurance

contracts, and similar pooled investment vehicles) to administrative service providers (record-

keepers, administrators, trustees) in connection with 401(k) and other types of defined

contribution plans.  This transfer may include a monetary amount or a non-monetary benefit such

as a credit for services, equipment, educational materials, conferences, meetings or seminars at

resorts or luxury hotels, or the like.

65.     The Plans or their agent (a third-party administrator, consultant, or similar

fiduciary) seeking to invest Plan assets in an investment vehicle (a mutual fund, common and

collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an agreement that sets the costs assessed against each dollar invested by specifying the expense ratio and available Revenue Sharing (contained within the expense ratio).

66.     In Revenue Sharing arrangements, the Plans and the Fund agree upon an asset-based fee that is not the true price for which the Fund will provide its service.

67.     Instead, the Fund's agreed asset-based fee includes **both** the actual price for which the Fund will provide its service **and** additional amounts that the Fund does not need to cover the cost of its services and to make a profit.

68.     The additional portion of the agreed-upon asset-based charge is "shared" with service providers or others who do business with the Plans or the Fund.

69.     As a result of Revenue Sharing arrangements, service providers or others who do business with the Plans or the Fund receive *both* a Hard Dollar payment from the Master Trust *and* additional revenue that the Fund "shares" with them.

70.     The total fees a Fund charges can vary widely based upon a number of factors, including without limitation:  the amount that the plan invests in the Fund; the level of sophistication of the plan fiduciary negotiating the fee agreement; the plan fiduciary's awareness of  Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the plan fiduciary conducts such negotiations; and the separate financial interests and/or agendas of the plan fiduciary and the Fund as they negotiate.

71.     Revenue Sharing arrangements are common among providers of guaranteed insurance contracts, mutual funds, common collective trusts, and private investment pools.

72.     Revenue Sharing also occurs with brokerage firms who provide services to the Funds.

73.     When 401(k) plan service providers receive compensation in the form of both
Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and
expenses that a plan incurs for any category of services (*i.e.* recordkeeping and administration,
investment advisory, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar
fees *and* Revenue Sharing payments be taken into account.

74.     Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation
to ensure that the fees and expenses assessed against the Plans are reasonable and incurred solely
in the interest of participants requires consideration whether the *total of both* the Hard Dollar *and*
Revenue Sharing payments paid for any category of services complies with this standard.

75.     Although Revenue Sharing monies arise only as a result of, and in connection
with, transactions involving the Plans, assets of the Plans, and service providers, Revenue
Sharing is not always captured and used for the benefit of the Plans and their participants.

76.     When Revenue Sharing is foregone, the Plans pay additional Hard Dollar fees to
the service providers (since no Revenue Sharing payments are available to offset those Hard
Dollar costs), and also pay additional money to the Fund, beyond what the Fund would normally
charge and keep (because the Funds' expense ratio includes both the actual price of the Fund's
services and revenue sharing amounts).

77.     Consequently, in determining whether the Plan Administrator or other fiduciary
has fulfilled its obligation to ensure that the fees and expenses assessed against the Plans are
reasonable and incurred solely in the interest of participants, foregone Revenue Sharing must
also be taken into account.

78.     When both Hard Dollar payments and revenue sharing (whether transferred
among Plan service providers or available in respect of the Plans' investments but forgave due to

Defendants' inattention or incompetence) are taken into account, Defendants have cause or allowed the Plans' participants to pay fees and expenses from their 401(k) retirement savings.

**Revenue Sharing Arrangements Are Not Disclosed to Participants**

79.    Revenue Sharing is not disclosed to participants and government regulators, even though it may account for a greater portion of certain categories of service provider payments than do Hard Dollar disbursements to those same providers.

80.    Accordingly, industry commentators and experts have dubbed Revenue Sharing payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce participants' retirement savings.

81.    By entering into, allowing, or failing to monitor, discover, prevent, or recover assets from these undisclosed Revenue Sharing arrangements and payments, Defendants have and continue to deprive the Plans' participants of true and accurate information regarding:

A.    How much they are paying in fees and expenses for the their Plan;

B.    Who is receiving Plan assets through Revenue Sharing;

C.    How much service providers are paid in addition to their disclosed, Hard Dollar fees; and

D.    Whether the total amount paid to services providers (*i.e.* disclosed, hard dollar fees *combined with* Revenue Sharing payments) is reasonable and incurred solely for the participants' benefit.

**Investment Management and Other Fees Assessed Against
Employer Stock Funds**

82.    Employer stock funds or company stock funds ("Employer Stock Funds") are an investment option in many 401(k) plans, especially those of large employers with stock that is publicly traded on recognized stock exchanges.

83.    The General Dynamics Employer Stock Fund provides the participants in both Plans with the opportunity to use a portion of their 401(k) retirement savings to purchase stock in the company for which they work.

84.    Beyond providing an *opportunity* for participants to invest in their employer's stock, General Dynamics' matching contributions are, or have been, made in only General Dynamics stock and/or larger matching contributions are provided for participants who choose to invest in General Dynamics stock than in other investment alternatives.

85.    Once invested in the General Dynamics stock fund, General Dynamics restricts when a participant may transfer his or her 401(k) savings out of the Fund to other investment alternatives and when they can liquidate the employer match, which is also in company stock.

86.    By their nature, Employer Stock Funds like the General Dynamics Stock Fund are undiversified and risky, especially when they represent a disproportionately high percentage of a participant's retirement savings.

87.    While such Funds benefit employers by providing a steady market for the employer's stock and billions of dollars in working capital from their employees' salaries, Employer Stock Funds cause 401(k) participants to embrace the risks inherent in undiversified investing.

88.    For the typical 401(k) participant, the risk that an undiversified Employer Stock Fund imposes is greater than that of other undiversified investments.

89.    The typical 401(k) participant, before placing any retirement savings in an Employer Stock Fund, relies on the stability and financial viability of his or her employer as the basis of his or her standard of living: the participant's present salary, healthcare and other

benefits, as well as his or her pension (if any) and retirement health insurance depend upon the employer's continued solvency and viability.

90.     Thus, the same risk that could impair the participant's investment in the Employer Stock Fund – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-401(k) retirement benefits.  The risks are correlated and, if realized, would financially devastate most participants.

91.     Recent, high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

92.     Purportedly countering these concerns, Plan Sponsors and Administrators who establish and administer Employer Stock Funds, including General Dynamics, suggest that employees' ownership of employer stock increases the employees' concern for the financial well-being of the employer, fosters a feeling of ownership of and identification with the employer, and enhances productivity.

93.     Regardless of the risks and benefits inherent in Employer Stock Funds, from a fee and expense standpoint, they *should be* a low cost investment alternative for participants in the employer's 401(k) plan.

94.     Employer Stock Funds do not need to pay for investment management, which constitutes the largest portion of most Funds' fees and expenses and thus the largest portion of Funds' expense ratio.  By their very nature, Employer Stock Funds forgo such investment management and hold an undiversified portfolio containing employer stock.  Therefore, Employer Stock Funds should not charge investment management fees.

95.     It is pivotal to participants' returns that Plan Sponsors and Administrators ensure there are no expenses assessed against participants' savings in Employer Stock Funds or, if any,

are as minimal *and* that the Employer Stock Fund does not hold cash of any significance on a continuous basis.

96.     Plan participants invest in Employer Stock Funds with the goal of sharing in their employer's financial success through the receipt of dividends and the increase in the value of the employer's stock.

97.     However, if an Employer Stock Fund's charges fees and expenses, and holds cash, as General Dynamics has done, it undermines the extent to which participants can do so.  This is especially true when the Employer Stock Fund's performance is compared to that of investors who purchase the employer's stock directly, instead of through the employer's 401(k) plan.

98.     Participants in the General Dynamics' Plans who invest in the General Dynamics Stock Fund do not own shares of General Dynamics' stock directly.  They own units of the General Dynamics Stock Fund.

99.     Each General Dynamics Stock Fund unit represents a portion of the shares of General Dynamics stock in the Fund *and* a portion of the cash also held in the Fund, which can be as much as four percent.

100.    The value of the General Dynamics Stock Fund unit is, and has been, reduced by the fees and expenses assessed against the assets in the Fund, and by the cash - - rather than General Dynamics Stock - - the Fund holds

101.    As a result, the return of the Plans' participants receive on their investment in the General Dynamics Stock Fund is, and has been, in general, lower than that of an investor holding a portfolio of pure employer stock outside of the Plans.

102.    The amount of cash that the General Dynamics Stock Fund holds also reduces the extent to which participants share in their employers' financial success.

103.    If the value of General Dynamics' stock is rising - - as it has - - or if it is paying dividends, participants who place their retirement savings in this Fund naturally want *every* dollar they save to earn such investment gains.

104.    But the portion of the participant's savings that remains in cash, and is not used to purchase the employer's securities, does not generate such investment gains.  Instead, its value remains essentially the same.

105.    For example, if a *non-401(k) investor* purchases 100 shares of the General Dynamics' stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1,000 gain on the initial $10,000 investment.

106.    However, a participant placing the same $10,000 in the General Dynamics Stock Fund does not receive 100 shares of the employer stock.  He or she receives General Dynamics Stock Fund units representing an interest in the shares of General Dynamics' stock held in the Fund *and* an interest in the Fund's cash.

107.    If the General Dynamics Stock Fund held 4% cash and 96% employer stock, the 10% increase in the value of the stock would translate into a $960 gain, instead of the $1,000 earned by the non-Plan investor.  The value of the cash held in the General Dynamics Stock Fund would remain essentially static.

108.    In this example to make matters worse, participants investing $10,000 in the General Dynamics Stock Fund also will have to pay fees and expenses.  These fees and expenses will further reduce the participants' return.

109.    While this difference may seem modest, the General Dynamics Stock Fund is one of the largest of all investment alternatives, containing almost two billion participant dollars.

110.    Plan participants' returns in the General Dynamics Stock Fund have substantially underperformed those of complete strangers to the Company investing outside of the Plans.

111.    General Dynamics has failed, and continues to fail to disclose and explain to participants of the Plans that the return participants receive on employer stock in the General Dynamics Stock Fund is lower than that enjoyed by complete strangers to the company.

112.    General Dynamics obscures this fact in a variety of ways.  For example, in fact sheets provided to participants, charts and graphs compare the performance of the General Dynamics Stock Fund to the S&P 500, but do not make a similar comparison between the performance of the General Dynamics Stock Fund and the performance of General Dynamics stock.

113.    General Dynamics violated its fiduciary obligations under ERISA by: (A) maintaining and holding, causing to be maintained or held, or allowing to be maintained or held, excess cash in the General Dynamics Stock Fund and thereby impairing participants' returns; and/or (B) causing and/or allowing unreasonable and unnecessary fees to be assessed against participants' accounts in the General Dynamics Stock Fund.

### Defendants' Non-Compliance with ERISA § 404(c)'s Safe Harbor Requirements and Concealment of  Fiduciary Breaches

114.    As set forth above, the Defendants did not disclose, and to this day have not disclosed, the fact that the Plans service providers are engaging in Revenue Sharing, that Revenue Sharing was available for the benefit of the Plans and their participants, or the amount of Revenue Sharing payments made by or to service providers.

115.    As set forth above, the Defendants have not properly disclosed and explained the effect of the General Dynamics Stock Funds fees and cash holdings on Plan participants investment returns.

25

116.    Participants in the Plans do not have complete and actual knowledge of the fees and expenses being charged to the Plans that ultimately reduced their account balances.

117.    Plan fiduciaries, including the Defendants, have not disclosed to participants, and participants do not know:

    a.    the actual "annual operating expenses" of the investment options in the Plans, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)(2)(i); and

    b.    the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

118.    As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the fiduciaries to disclose the actual expenses incurred by both Plans or the Master Trust, including available Revenue Sharing, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan."  29 C.F.R. §2550.404c-1(b)(2)(B).

119.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plans.  Further, participants lacked the information necessary to have knowledge of the Defendants' breaches of fiduciary duty.

120.    In fact, in their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

121.    ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the participants regarding the administration of the Plans.

122.    A fiduciary's silence or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

123.    Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

      a.    the total amount of fees and expenses reasonable and necessary to operate each Plan;

      b.    the total amount of amount of fees and expenses each Plan actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

      c.    the availability of Revenue Sharing;

      d.    the true and accurate details regarding the revenues and expenses of each Plan;

      e.    the true and accurate operating expenses that reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the investment alternatives;

      f.    the true and accurate transaction fees and expenses that affect the participants' account in connection with the purchase or sale of investment alternatives;

      g.    the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which each Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

      h.    other revenue and expense information necessary for the participants to understand and protect their interests.

124.    Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

125.     Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
### [Breach of Fiduciary Duty – ERISA §502(a)(2)]

126.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 125 as though fully set forth here.

127.     As set forth in detail above, Defendants owe to each Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct themselves as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of each Plan;

B.  To perform their duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plans and their participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that each Plan's assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To track and account for all transactions involving the Plans and their assets so as to ensure that each Plan's assets are retained, managed, and disbursed in compliance with the corresponding Plan Document and ERISA;

E.   To track and account for all transactions involving the Plans and their assets so as to ensure that each Plan's assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

F.   To ensure that the fees and expenses incurred by the Plans are reasonable and incurred for the sole and exclusive benefit of each Plans participants and beneficiaries;

G.   In entering into agreements with service providers to the Plans, to ensure that the payments from the Plans – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of participants and beneficiaries;

H.   In operating and administering the Plans, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of participants;

I.   In operating and administering the Plans, on an ongoing basis to monitor the payments made by the Plans to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of participants and beneficiaries;

J.   To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K. To inform itself of trends, developments, practices, and policies in the retirement, financial investment and securities industry that affect the Plan and to remain aware of and knowledgeable of such trends, practices, and policies on an ongoing basis;

L. To communicate with participants and beneficiaries regarding the Plans honestly, clearly, and accurately;

M. To affirmatively and without request provide participants and beneficiaries with honest, accurate, and complete information they need to understand their investments in the Plans; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

N. Upon request, to provide further and information to participants and beneficiaries regarding the operation and administration of the Plans and the expenses incurred in doing so; and

O. To provide honest, accurate and complete information to participants and beneficiaries regarding the costs associated with their various investment choices and directions.

128.     As set forth in detail above, Defendants breached their fiduciary obligations to both Plans, participants and beneficiaries, and the Class by, among other conduct to be proven at trial:

A. Causing the Plans to enter into agreements with service providers under which each Plan pays, directly or indirectly, fees and expenses that are

unreasonable and not incurred solely for the benefit of participants and beneficiaries;

B.  Allowing each Plan to pay, directly or indirectly, fees and expenses that are unreasonable and not incurred solely for the benefit of participants and beneficiaries;

C.  Failing to monitor the fees and expenses paid by each Plan and the Master Trust and, by such failure, causing or allowing the Plans to pay fees and expenses that are unreasonable and not incurred solely for the benefit of participants and beneficiaries;

D.  Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry that affect the Plans; and failing to  remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

E.  Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

F.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plans were reasonable and incurred solely for the benefit of Plan participants;

G.  Failing to communicate with participants and beneficiaries regarding the Plans honestly, clearly, and accurately;

H.  Failing to inform properly and to disclose to participants the fees and expenses that are, or have been, paid by the Plans;

I.   Failing to inform or disclose to participants in proper detail and clarity the transactions, fees, and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

J.   Failing to discover, disclose and stop the charging of  hidden and excessive fees to the Plans;

K.  By the foregoing conduct, failing to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters.

129.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plans, and the Plans' participants and beneficiaries have suffered financial losses and damages.

130.     Further, as set forth in detail above, Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. § 1104(c).  Accordingly, Defendants are liable for participants' and beneficiaries' investment losses in the Plan.

131.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are liable to restore to the Plans the losses they experienced as a direct result of Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
**[Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]**

132.     Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 131 as though fully set forth here.

133.     In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., §1132(a)(3).

134.     Under ERISA § 502(a)(3), a participant may enjoin any act that violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

135.     Defendants are the primary fiduciaries of the Plans and occupy a position of trust and confidence in connection with the Plans, the assets of each Plan, and the participants and beneficiaries.

136.     Defendants have exclusive discretion and control over the assets of each Plan and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in [each] Plan and their beneficiaries and defraying reasonable expenses of administering the Plan[s]."

137.     Although *only* participants and beneficiaries are entitled to either the Plans' assets or the benefit of Plans' assets, in the absence of full and candid disclosure from Defendants, participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

138.     Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

139.     As set forth in detail above, Defendants have caused or allowed the Plans to pay, directly or indirectly, excess fees and expenses to the Plans service providers.

140.     Defendants, and not the Plaintiffs, are the entities that have or should have specific and detailed information regarding how each Plan's assets have been treated and disbursed in this regard.

141.     Accordingly, the Court should order that Defendants render an accounting of all transactions, disbursements, and dispositions occurring in, in connection with, or in respect of, the Plans and their assets.

142.     Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plans or paid to third parties, whether paid directly by the Plans or the Master Trust or indirectly transferred among service providers or other third parties.

143.     Plaintiffs respectfully request that the Court surcharge against the Defendants and in favor of the Plan all amounts involved in transactions that such accounting reveals were or are improper, excessive, or in violation of ERISA.

144.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above and to cause them to cease in order for the participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plans and all similarly situated participants and beneficiaries, respectfully request that the Court:

- find and  declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to both Plans all losses that the Plans incurred as a result of the conduct described above and to restore the Plans to the position they would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plans;

- remove the fiduciaries who have breached their fiduciary duties or enjoin them from future breaches of ERISA;

- award actual damages to the Plans in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plans all amounts involved in transaction which such accounting reveals were or are improper, excessive, or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


By:  _____/s/ Jerome J. Schlichter
        Jerome J. Schlichter, 02488116
        Daniel V. Conlisk
        Heather Lea, 6276614
        120 W. Main Street, Suite 208
        Belleville, IL 62220
        100 S. Fourth Street., Suite 900
        St. Louis, Missouri 63102
        (314) 621-6115
        (314) 621-7151 (Fax)
        jschlichter@uselaws.com
        dconlisk@uselaws.com
        hlea@uselaws.com

        ATTORNEYS FOR PLAINTIFFS/
        CLASS REPRESENTATIVES
        Eric Will, Richard Cotterman,
        Daniel Kuczon, and James Barnes