# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ERIC WILL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 06-698-GPM** |
| **v.** | ) | |
| | ) | **Judge G. Patrick Murphy** |
| **GENERAL DYNAMICS CORPORATION,** | ) | |
| | ) | **Mag. Judge Clifford J. Proud** |
| **Defendant.** | ) | |

## DECLARATION OF HENRY EICKELBERG

I, Henry Eickelberg, declare as follows:

1.     I am Vice President, Human Capital Processes at General Dynamics Corporation. I have been in this position since May 2007. From March 2005 to May 2007, I served as Staff Vice President, Human Capital Processes at General Dynamics. From 1997 to March 2005, I served as Staff Vice President for Benefit Programs at General Dynamics. In these positions, I have had responsibilities relating to the company's 401(k) plans.

2.     General Dynamics is a major defense contractor engaged in the aerospace, combat systems, marine systems and technology businesses.

3.     I have a B.S.C. from DePaul University (1979); a J.D. from John Marshall Law School (1983); and a L.L.M. from John Marshall Law School (1986).

4.     I am a certified public accountant in the State of Illinois (1980).

5.     I am licensed to practice law in the State of Illinois and the District of Columbia.

6.     I am a frequent lecturer and speaker on retirement related issues.

7.     I am an adjunct professor of law at Georgetown University Law Center, and teach classes on ERISA in Georgetown's L.L.M. program.

8.     I am a member of the Executive Committee of the American Benefits Council (ABC), and also serve on the Board of Directors of the ERISA Industry Committee (ERIC).  I have chaired the ABC's Legal Affairs committee.  I am also a member of the Board of Directors of Deallawyers.com, which is a website dedicated to the lawyers in the corporate mergers and acquisitions area.

9.     Prior to joining General Dynamics, I worked for William M. Mercer, a world-wide benefits consultancy.  I also worked as a private attorney in the benefits area.

<u>Background Regarding The Plans</u>

10.     On September 11, 2006, among other benefit plans, General Dynamics offered the following:  the General Dynamics Corporation Savings and Stock Investment Plan ("the SSIP") and the General Dynamics Corporation Hourly Employees' Savings and Stock Investment Plan ("the Hourly Plan") (collectively "the Plans" or "the SSIP").

11.     Richard Cotterman and Daniel Kuczon were participants in the SSIP.

12.     Eric Will was a participant in the Hourly Plan.

13.     Effective January 1, 2007, General Dynamics reorganized the SSIP into three separate plans to accommodate new design features applicable to the different General Dynamics business units.  Two new plans were spun off from the SSIP:  the General Dynamics Corporation Savings and Stock Investment Plan (Plan 4.5) (hereinafter "the SSIP 4.5") and the General Dynamics Corporation Savings and Stock Investment Plan (Plan 5.0) (hereinafter "the SSIP 5.0"), and the SSIP was renamed the General Dynamics Corporation Savings and Stock Investment Plan (Plan 3.0) (hereinafter "the SSIP 3.0").  Also, the Hourly Plan was re-named the General Dynamics Corporation Savings and Stock Investment Plan for Represented Employees ("the Represented Employees Plan").

14.     Effective January 1, 2007, Richard Cotterman is a participant in the SSIP 4.5; Daniel Kuczon is a participant in the SSIP 3.0; and Eric Will is a participant in the Represented Employees Plan.  No named plaintiff is a member of the SSIP 5.0.

15.     Exhibit 33 is a true and correct copy of the Plan Documents for the Plans.

16.     General Dynamics provides a company match program, whereby it matches certain pre-tax salary reduction contributions that employees elect to have General Dynamics contribute to the Plans on their behalf.

17.     Currently, there are eight investment options available to participants in the Plans: Balanced Fund, Fixed Income Fund, Bond Index Fund, Small Cap Fund, General Dynamics Stock Fund, S&P 500 Fund, Large Cap Value Fund, and Large Cap Growth Fund.

18.     Plan participants choose and control which investment options among the eight funds currently offered within the Plans in which to invest their 401(k) plan monies.

19.     General Dynamics is the Plan sponsor, Plan administrator, and named fiduciary with respect to the Plans.

20.     All plan assets are held in a single master trust, under the General Dynamics Savings and Stock Investment Plan Master Trust Agreement.  [Ex. 32.]

Pre-Complaint Events

21.     In approximately May 2006, I became aware that plaintiffs' lawyers ("the Schlichter law firm") began running newspaper advertisements soliciting General Dynamics' retirees and other participants in its 401(k) Plans to call their offices to discuss their "benefits." [See, e.g., Ex. 13.]

22.     Starting in May 2006, certain plan participants (who later became the named plaintiffs) sent letters to General Dynamics requesting information regarding the amount of costs

3

and expenses paid to the various service providers to the Plans. Among other things, the plaintiffs requested information about: the "compensation received by each service provider"; "the operating expense ratio for each fund and trust in the Plan for the current year and for each of the last five years"; and "the fees or expenses that are removed from the revenue of [plan participants'] investments." Exhibits 14, 15, 18 and 19 are true and correct copies of the letters General Dynamics received from the plaintiffs, which I received in my position as Staff Vice President, Human Capital Processes.

23.     I responded to these letters on behalf of General Dynamics, and provided detailed information and documents concerning the Plans. Exhibits 17, 20 and 21 are true and correct copies of the response letters (with attachments) I prepared and sent to the plaintiffs on the dates indicated on each of the respective letters. Among other information, I provided the participants with documents identifying the compensation paid by the Plans to each service provider, including excerpts of the Form 5500s which itemize the fees paid to each service provider. I also provided then-current operating expense ratio for each investment option offered within the Plans. Attached to the letters were: the Plans' Form 5500 annual reports, the plan documents, the summary plan description documents, fund fact sheets, and certain fund prospectuses.

24.     Exhibit 16 is a true and correct copy of a June 19, 2006 letter I sent to Richard Cotterman, acknowledging receipt of his May 18, 2006 letter and notifying him as to the copying costs associated with his request for information. In my letter, I notified Mr. Cotterman of the Plan requirement that he pay the copying costs, and asked him to verify that he would be responsible for paying these costs. Mr. Cotterman did not respond to my letter.

General Dynamics' Disclosures Regarding Costs and Expenses Of Plans

*Fund Fact Sheets*

25.     Every quarter, General Dynamics issues a quarterly report for each of the fund investment options called a Fund Fact Sheet.

26.     Exhibit 22 are true and correct copies of the Fund Fact Sheets issued by General Dynamics for the third quarter of 2006, which are representative of the Fund Fact Sheets issued every quarter.

27.     The Fund Fact Sheets are part of the Summary Plan Description ("SPD") of the Plans.

28.     The Fund Fact Sheets are made available to all plan participants.

29.     The Fund Fact Sheets disclose that there are costs and expenses associated with investing in the various investment options. In particular, the reports list the "fund expenses" as a percentage of average net assets for each investment option. These expense ratios reflect the approximate amount by which the plan level costs and expenses reduce the rate of return or gross earnings of the investment funds.

30.     The Fund Fact Sheets further state that the reported fund expense ratios included "fees payable to the record keeper, trustee, investment manager, outside auditor and legal services." [Ex. 22.] In addition, the Fund Fact Sheets disclose that the performance results provided for each investment option are "net of all expenses deducted from the Fund."

31.     My office reviews the Fund Fact Sheets, including the reported fund expenses, before they are issued each quarter, which is another means by which General Dynamics monitors the costs and expenses associated with the Plans.

*The Plan Details*

32.     General Dynamics issues a document entitled "The Plan Details:  Connecting to the General Dynamics Corporation Savings and Stock Investment Plan," which is updated as necessary.

33.     Exhibit 23 is a true and correct copy of the Plan Details brochure issued by General Dynamics.

34.     The Plan Details is part of the SPD of the Plans.

35.     The Plan Details is provided to all plan participants.

36.     The most current Plan Details brochure is also available to all plan participants on the General Dynamics' benefits website.

37.     The Plan Details document includes a section regarding "Administrative Expenses." [Ex. 23 at 25.] It informs participants:  "Any reasonable and proper expenses incurred in the administration of the SSIP, including, without limitation, any third-party consultant, trustee, investment manager, legal or recordkeeping fees, may be paid by the SSIP from the trust assets and, consequently, will be charged to individual member accounts." [Id.]  It further explains: "Expenses charged to your SSIP account balance are reflected as an adjustment to investment earnings or, in certain cases, may be charged as a direct fee payable by your account." [Id.]  In addition, this document informs participants that information regarding the "expenses of funds offered through the [the Plans] is available in the Fund Fact Sheets." [Id. at 21.] As discussed above, the quarterly Fund Fact Sheets inform participants as to the expense ratios of each of the investment options offered within the Plans.

*Fund Prospectuses*

38.     To the extent required by law for any registered mutual funds available within the plans in which participants are invested, General Dynamics provides plan participants with the

fund prospectuses.  For example, Exhibit 24 is a true and correct copy of the May 2006 prospectus for the Dodge & Cox mutual fund, which was distributed to plan participants invested in this fund.

*Participant Account Statements*

39.     Every quarter, every plan participant receives an account statement which reflects, among other information, their share of the net income of the various investment funds after the payment of the plan-level costs and expenses of the plans (e.g., the costs and expenses for trustee, record-keeper and investment management services).  Among other information, the account statements provide the opening and closing account balances, the rate of return enjoyed by the participant's respective investments during the period, the participant's overall rate of return, the participant's contributions during the reporting period, their earnings by fund, and the amount of any company matching contributions.  [See Ex. 25.]

*The Plans' Annual Reports (Form 5500s; SARs; Form 11-K)*

40.     Pursuant to ERISA and the governing DOL regulations, General Dynamics files an annual report for the Plans and the Master Trust.  These annual reports are publicly filed with the Department of Labor on its Form 5500.

41.     Exhibit 26 is a true and correct copy of (excerpts of) the Form 5500's filed by the Plans and the Master Trust for 2005, which I signed on behalf of General Dynamics, and which are illustrative of the Form 5500s filed every year.

42.     Plan participants are informed that the annual reports are available to them upon request.  For example, in the Summary Annual Reports (discussed below) that are sent to all plan participants, participants are informed that they may request copies of the full annual report.

43.     General Dynamics' annual reports disclose the total costs and expenses paid by the Plans from trust assets, including the amounts paid to each of the various service providers. For example, in its 2005 annual reports, General Dynamics disclosed that:  the Salaried Plan paid total costs and expenses of $4,518,341; the Hourly Plan paid total costs and expenses of $1,574,409; and the Master Trust paid $1,342,092 in total annual expenses.  [Ex. 26 at Schedule H.]  The 2005 annual reports further identified the amounts paid to the service providers to the plans.  [Id. at Schedule C.]

44.     I sign the Form 5500's on behalf of General Dynamics.  The work attendant to the compilation and filing of the Form 5500's is another means by which General Dynamics monitors the costs and expenses associated with the Plans.

45.     In addition to its full annual reports, pursuant to ERISA and the governing DOL regulations, General Dynamics provides each plan participant with a Summary Annual Report ("SAR") which summarizes the information contained in the full annual report.  Exhibit 27 is a true and correct copy of the SARs issued by General Dynamics for 2005, which are illustrative of the SARs distributed every year.  The SARs inform participants as to the total plan expenses including administrative expenses.  For example, the 2005 SARs informed participants that the Salaried Plan paid total costs and expenses of $4,518,341; and that the Hourly Plan paid total costs and expenses of $1,574,409.  Participants are further informed that they may request the full annual report which includes "information on payments to service providers."

46.     Finally, as required by the Securities and Exchange Commission, each year General Dynamics files a Form 11-K with the Securities and Exchange Commission for each of the Plans.  Exhibit 28 is a true and correct copy of the Form 11-Ks filed by General Dynamics for the year 2005, which are representative of the Form 11-Ks filed every year.  These public

8

filings are available, among other places, on General Dynamics' website.  The Form 11-K contains the audited financial statement for the Plans, which is part of each Plans' full annual report.  The Form 11-K discloses the administrative expenses paid by the Plans.  For example, the 2005 Form 11-Ks disclosed that:  the Salaried Plan paid administrative expenses of $4,518,341; the Hourly Plan paid administrative expenses of $1,574,409; and the Master Trust paid $1,342,092 in general expenses.

*GD Benefits Website*

47.     There is a website specifically dedicated to General Dynamics' employee benefit plans, including its 401(k) plans.  Every plan participant has access to the website.  The website provides a wealth of information to participants.  For example, among other information regarding fees, the website notifies participants:  "Yes, Your Funds Have Fees."  Exhibit 29 is a true and correct copy of a screenshot of this portion of the General Dynamics benefits website.  This section of the website informs participants:  "All funds come with fees. . . . Since fees come out of your pocket, it's important to understand a fund's expense ratio.  A fund's expense ratio is a percentage deducted from fund assets to cover the fund's management fees and operating costs. . . . A lower expense ratio means you get to keep more of the fund's earnings."  The website also provides an example of how a fund's expense ratio affects participants' earnings:  "If you had $10,000 in your account and your fund's annual return was 8%, your net return that year with an expense ratio of 1.5% would be 6.5%.  Therefore, $150 is subtracted from your $800 in earnings.  If your fund's expense ratio were only 1%, your reduction would be $100.  So while 0.5% doesn't sound like a big difference, it can add up."

*"Quick Facts"*

48.     General Dynamics occasionally distributes "Quick Facts" publications to all participants regarding topics of interest to the Plans.  For example, in connection with its 1997 fund line-up re-structuring, General Dynamics distributed to participants a "Quick Facts" publication discussing the costs and expenses associated with investing in the Plans.  Exhibit 30 is a true and correct copy of Quick Facts Issue No. 4 entitled "Taking A Closer Look At Your Investment Options and Plan Costs."  Also in 1997, General Dynamics distributed another "Quick Facts" publication discussing the costs and expenses associated with investing in the Plans.  Exhibit 31 is a true and correct copy of Quick Facts Issue No. 8 entitled "Taking A Closer Look At SSIP Plan Costs."

General Dynamics Conducts RFPs For Trustee Services

49.     The Northern Trust currently serves as the plan trustee and custodian for the Plans.  Its current fee arrangement [See Exs. 67-69], resulted from a competitive bidding process General Dynamics conducted in 1997 and again in 2002, to ensure that the Plans were receiving the overall best value.

*1997 Request For Proposal*

50.     In early 1997, trustee and custodial services (including benefit payments and tax withholding) for General Dynamics' defined benefit and defined contribution plans were performed by multiple vendors.  At that time, General Dynamics considered the possibility of reducing the number of vendors performing these services for the overall benefit of plan participants.  As part of this process, General Dynamics decided to solicit bids from the marketplace for the trustee position within the SSIP.   General Dynamics asked Hewitt Associates, which served as record keeper for the SSIP, to assist with the RFP process.

51.     In conjunction with RFP, Hewitt developed a list of issues to consider.  Exhibit 53 is a true and correct copy of a July 22, 1997 letter (with attachments) Hewitt sent to Robert Stewart at General Dynamics.  Hewitt provided a list of trustees with which it had established daily valuation linkages, because the Plans had recently transitioned to a daily valuation environment.

52.     In August 1997, General Dynamics sent a request for proposal for custody and trustee services to four vendors:  Bank of New York, Mellon Bank, Northern Trust and State Street Bank & Trust.  True and correct copies of the letters General Dynamics sent to each of these vendors on August 4, 1997 are attached as Exhibit 54.  The vendors were informed that the purpose of the request was to consolidate trustee, custody and benefit payment services in a single vendor.  General Dynamics also informed the vendors that it was considering separate trustees for its pension and 401(k) plan assets.

53.     Exhibit 55 is a true and correct copy of the request for proposal along with the overview of current plan arrangements and background information regarding the Plans which General Dynamics sent to each vendor in August 1997.  The request for proposal sought detailed background information from each vendor, including a list of current clients, assets under management, organizational structure and resources available to devote to General Dynamics' employee benefit trusts.  In addition, the request sought information concerning the vendor's interaction with investment managers and its ability to perform a number of trustee/custodian services including execution of trades, inter-fund transfers, loan processing, benefit payments and proxy services.  The request also required each vendor to describe its experiences with the SSIP record keeper, Hewitt, and asked detailed questions designed to elicit a comprehensive picture of each vendor's resources and capabilities with respect to the following:  daily valuation

of a 401(k) plan; internal quality control procedures and accounting procedures; client access to reports of transactions, asset valuation and other information; benefit payments; communications with plan participants; cash management including cash sweep operations; settlement of transactions; and quality and performance standards.  Each vendor was also asked to provide a fee proposal for defined contribution and defined benefit services.  Vendors were also asked to provide information regarding any history of fee increases, fees for adding or deleting investment funds, fees for payment processing, and fee guarantee policies.

54.   Proposals from the vendors were received in or around August 1997.

55.   General Dynamics reviewed the proposals and compared each vendor's proposed fees for master trust services, short-term investment funds, payment processing and securities lending for the implementation year (1998) and the next two years (1999 and 2000).   A true and correct copy of a summary prepared at my direction regarding the fee proposals received from each of the vendors is attached as Exhibit 56, which showed that Northern Trust's proposed fees for master trust and payment processing services were the lowest among the vendors:

| Vendor | Year 1 (1998) | Years 2 and 3 (1999-2000) |
|---|---|---|
| Bank of New York | $540,000 | $540,000 |
| Mellon Bank | $528,000 | $528,000 |
| Northern Trust | $523,000 | $451,000 |
| State Street | $685,000 | $643,000 |

56.   As to securities lending (which at that time was permitted within the General Dynamics' pension plans), the vendors proposed the following fee splits:

| | |
|---|---|
| Bank of New York | 75/25 |
| Mellon Bank | 70/30 |
| Northern Trust | 70/30 |
| State Street | 70/30 |

57.   After reviewing the proposals, General Dynamics decided to retain The Northern Trust as the exclusive provider of custody and trustee services for both its defined benefit and

401(k) plans.  Exhibit 57 is a true and correct copy of a September 18, 1997 letter I sent to Sheila Penrose at The Northern Trust notifying her that The Northern Trust had been selected to provide trustee services for all General Dynamics retirement plans.  General Dynamics selected The Northern Trust because it believed The Northern Trust offered the best overall value for plan participants, including its cost-effective fee package, historical relationship with General Dynamics and demonstrated commitment to the trustee service business.

*2002 Request For Proposal*

58.     In 2002, General Dynamics conducted another competitive bidding process between The Northern Trust and State Street Bank & Trust ("State Street") relating to the Plans' custody and trustee services function.

59.     In April 2002, General Dynamics contacted State Street and The Northern Trust about submitting proposed fees for trustee and custodial services.  Working with an outside consultant (Hager Strategic), General Dynamics developed a list of questions related to trustee services and a fee grid for each vendor to complete.

60.     State Street submitted a proposal for custody and trustee services to General Dynamics on May 3, 2002.  Exhibit 60 is a true and correct copy of the fee proposal I received from Jim Murphy of State Street on May 3, 2002.  Exhibit 61 is a true and correct copy of supplemental information I received from Scott Drimmer of State Street on May 21, 2002 regarding its fee proposal for securities lending.

61.     Northern Trust submitted its fee proposal on May 14, 2002.  Exhibit 62 is a true and correct copy of the fee proposal I received on May 14, 2002 from Griff Ehrenstrom of The Northern Trust.

62.    A side-by-side comparison of the respective bids indicated that State Street's proposed fees were more than twice those of Northern Trust ($529,956 vs. $1,175,805).  A true and correct copy of this fee comparison prepared at my direction is attached as Exhibit 63.

63.    Approximately one week later, Northern Trust sent a revised proposal to General Dynamics, proposing further reductions in its custody, securities lending and cash sweep fees. Northern Trust offered to reduce its account fee from $1,500 per account to $500 per account; its securities lending revenue fee from 30% to 25% of gross lending revenue; and its cash sweep fee from 15 basis points to 8 basis points.  Exhibit 64 is a true and correct copy of the revised fee proposal I received from Ann Chamberlain of The Northern Trust on May 22, 2002.

64.    A revised side-by-side comparison of the respective bids reflecting The Northern Trust's fee reductions indicated that The Northern Trust's total proposed fees were now even more favorable for the Plans:  $426,956 (The Northern Trust) versus $1,175,805 (State Street). Exhibit 65 is a true and correct copy of the further revised fee comparison prepared at my direction which I received via e-mail on May 23, 2002 from Joseph Gallagher of FAMCO.

65.    After even further negotiations, Northern Trust agreed to a further reduction in its share of securities lending revenue, from 25% to 20%.

66.    In comparing the securities lending programs offered by The Northern Trust and State Street, FAMCO advised General Dynamics that The Northern Trust's securities lending program was less aggressive and had never had a negative return, whereas FAMCO perceived that State Street took more risk.  Exhibit 66 is a true and correct copy of a May 15, 2002 e-mail I received from Joseph Gallagher of FAMCO.

67.    General Dynamics decided to retain Northern Trust as custodian and trustee. General Dynamics believed that Northern Trust offered the best overall value, including being

14

the low cost provider and offering the best combination of fees and quality services for the benefit of plan participants.

68.     Thereafter, General Dynamics negotiated a new fee schedule governing Northern Trust's trustee and custodial services consistent with the various pricing and other concessions and benefits General Dynamics secured for SSIP participants via this extensive RFP process. Exhibit 67 is a true and correct copy of the July 10, 2002 letter agreement between General Dynamics and The Northern Trust, which I signed on behalf of General Dynamics, containing the new fee schedule.

*Securities Lending*

69.     I have been familiar with securities lending and securities lending programs since at least the 1990s when General Dynamics' pension plans were participating in such programs.

70.     Prior to July 2000, General Dynamics' plan documents did not expressly permit securities lending within the Plans as to the securities owned by the Plans within its separately managed accounts.  Among other reasons, because securities lending is a means to attempt to gain additional assets while assuming certain risks attendant to such a program, General Dynamics decided not to participate in securities lending given the objectives of the funds offered as part of its 1997 fund line-up re-structuring.

71.     In 2000, General Dynamics re-visited its decision regarding securities lending.  In June 2000, after due consideration, General Dynamics amended its Master Trust Agreement to expressly permit securities lending.  A true and correct copy of the Master Trust Agreement, including the June 2000 Third Amendment thereto, is attached as Exhibit 32.

72.     Thereafter, General Dynamics, with FAMCO's assistance, negotiated a securities lending agreement with The Northern Trust.  At this time, I was aware of both the risks and

rewards of participating in a securities lending program, including the counterparty default, operational and collateral investment risks.

73.     The agreement General Dynamics negotiated with The Northern Trust provided for a 70/30 fee split.  A true and correct copy of the Securities Lending Agreement executed by General Dynamics with The Northern Trust is attached as Exhibit 59.  The 70/30 fee split reflected in this agreement was the same as General Dynamics received from The Northern Trust for the securities loaned out of General Dynamics' pension plans, which was the result of the competitive bidding process (discussed above) it had conducted a few years before.

74.     In approximately August 2000, after the agreement was executed, the Plans began participating in The Northern Trust's securities lending program, and began collecting income as a result of its participation.  The income generated from securities lending is directly credited to the accounts maintained by the Plans at The Northern Trust.  General Dynamics does not receive any of the income generated from securities lending.

75.     Effective July 1, 2002, as a result of the 2002 competitive bidding process (discussed above), the fee split on the securities lending program changed to 80/20 -- whereby the Plans receive 80% of the income generated by securities lending, and The Northern Trust received 20% of the income.  Exhibit 68 is a true and correct copy of the amended fee schedule agreement between General Dynamics and The Northern Trust, which I signed on February 21, 2003 on behalf of General Dynamics, setting forth the revised fee split arrangement effective July 1, 2002.  The 80/20 fee split remains in effect today.

*Float*

76.     General Dynamics is aware of float (the interest earned on uncashed checks), and negotiated an arrangement with The Northern Trust such that the Plans receive the benefit of

float. In particular, General Dynamics' agreements with The Northern Trust provide that float earned on uncashed checks is netted against the benefit payment fee charged to the plans (up to a maximum of 100% of the benefit payment fees) on a quarterly basis. [See Ex. 67; Ex. 69; Ex. 58.] The credit for float directly benefits the Plans, and not General Dynamics.

<u>Dodge & Cox</u>

77.    In 2004, General Dynamics decided to investigate the possible addition of two new types of funds to its SSIP fund line-up: a large cap value fund and a large cap growth fund. General Dynamics asked FAMCO to help survey the marketplace and recommend specific investment managers for each type of fund. FAMCO had previously assisted General Dynamics in its search for a large cap value manager for General Dynamics' pension plans in 2002, which resulted in General Dynamics hiring Dodge & Cox. [See Ex. 72.] General Dynamics, however, did not want to limit itself to the managers selected for the defined benefit plans and, therefore, asked FAMCO to conduct a review of the potential managers in the marketplace.

78.    In July 2005, FAMCO submitted a detailed recommendation memorandum. Exhibit 78 is a true and correct copy of the July 15, 2005 memorandum David Fogg and I received from Joseph Gallagher of FAMCO. FAMCO submitted a revised memorandum on July 28, 2005. Exhibit 79 is a true and correct copy of the revised July 28, 2005 memorandum David Fogg and I received from Joseph Gallagher of FAMCO.

79.    In its memorandum, FAMCO identified the steps it followed in connection with its search for possible investment managers. FAMCO screened a database (the Mobius database) containing performance and portfolio data on more than 1,300 managers. FAMCO screened for managers that had successful long-term track records, high "style correlations" and an ability to perform well when their style was out of favor. FAMCO further screened for managers with a

large number of assets under management, a portfolio of liquid, large cap stocks, a reasonable

fee rate and the ability to manage funds for 401(k) plans.

80.     In its memorandum, FAMCO recommended Dodge & Cox.  Attached to

FAMCO's memorandum was a chart listing the performance of eight (8) large cap value

managers over 1, 3, 5 and 10-year periods, as well as the performance over those time periods of

two indices, the S&P 500 Index and Russell 1000 Value Index.  The managers evaluated were:

- Legg Mason Capital Management
- TCW Group
- Harris Associates L.P.
- Dodge & Cox
- Oppenheimer Capital
- Armstrong Shaw Associates
- NWQ Investment Management Company, LLC
- PPM America, Inc.

Among this group, Dodge & Cox was the second best performer over a five-year period

(with an average annual return of 13.03%) and the top performer over a three-year period (with

an average annual return of 11.25%).  FAMCO recommended Dodge & Cox on the basis of its

strong performance over these periods, plus its solid performance during the 2000-02 bear

market (during which period it had average annual returns of 2.07%).  During these various

periods, Dodge & Cox significantly outperformed its benchmarks.

81.     Because Dodge & Cox had closed its separately managed account option,

FAMCO recommended that General Dynamics invest in Dodge & Cox's mutual fund (the

Dodge & Cox Stock Fund (DODGX).  FAMCO reported that Dodge & Cox would charge a net

fee of approximately 45 basis points after ten basis points of its standard 55 basis point fee (the

same fee, as required by law, charged to all investors in its mutual fund) was rebated for the

benefit of the Plans.  Dodge & Cox's fee, thus, was in the middle of the range of available fees

(between approximately 25 and 75 basis points) of the other large cap value managers considered by the company.

82.     As part of its memorandum, FAMCO further noted, among other things, that any SSIP assets under management would be counted by Dodge & Cox in calculating the fees relating to pension plans under the tiered fee schedule governing assets under management for the pension plans.

83.     I independently reviewed FAMCO's memoranda; discussed it with my supervisor, Walter Oliver (General Dynamics' Senior Vice President - Human Resources and Administration); and recommended to General Dynamics CEO, Nicholas Chabraja, that General Dynamics retain Dodge & Cox.  In making my recommendation, I was aware that Dodge & Cox, pursuant to its usual and customary practice, would count funds invested by the SSIP with Dodge & Cox as part of the total funds under management for purposes of the tiered fee structure relating the defined benefit plan's investment with Dodge & Cox.  I disclosed this matter to Mr. Chabraja.  I did not rely upon this incidental benefit in making my recommendation.

84.     The Dodge & Cox mutual fund (which was identified as the Large Cap Value Fund) became available as an investment option within the Salaried Plan effective January 1, 2006, and within the Hourly Plan effective March 1, 2006.  Dodge & Cox remains the investment manager of the Large Cap Value Fund.

85.     Because the Plans (via the Large Cap Value Fund) are invested in a registered mutual fund (DODGX), they are charged the same expense ratio as every other investor in the mutual fund.  As reflected in the Dodge & Cox prospectus (May 2006), because the expense ratio applicable to all investors is 52 basis points, the net expense ratio for the Plans (after the 10 basis point credit) is 42 basis points.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this _17_ day of December, 2007.

Henry Eickelberg

Document No. 1605835

# EXHIBIT 2

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **ERIC WILL, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 06-698-GPM** |
| **v.** | ) | |
| | ) | **Judge G. Patrick Murphy** |
| **GENERAL DYNAMICS CORPORATION,** | ) | |
| | ) | **Mag. Judge Clifford J. Proud** |
| **Defendant.** | ) | |

## DECLARATION OF DAVID FOGG

I, David Fogg, declare as follows:

1.      I am Vice President and Treasurer at General Dynamics Corporation.  I have been in this position since March 1998.  From November 1994 until March 1998, I served as Staff Vice President and Treasurer at General Dynamics.  From May 1994 until November 1994, I served as Staff Vice President and Assistant Treasurer.  From January 1994 until May 1994, I served as Director of Finance and Assistant Treasurer.  I initially joined General Dynamics in November 1991 as director of risk management.  Since 1994, I have certain responsibilities relating to the company's 401(k) plans.

2.      Prior to joining General Dynamics, I worked in corporate finance and risk management with B.F. Goodrich for four years and assistant treasurer with Uniroyal Goodrich Tire Company for five years.

3.      I served in the United States Air Force from 1973 until 1977.

4.      I received a bachelor's degree in economics and mathematics from Oberlin College and a master's degree in business administration from Columbia University.

5.      I regularly attend the meetings of General Dynamics' Investment Review Committee ("IRC"), which meets in advance of the Benefit Plans and Investment Committee

("BPIC") meetings to preview FAMCO's presentation regarding the performance and status of the Plans.

      6.      I also regularly attend meetings of General Dynamics' BPIC.

<u>FAMCO</u>

      7.      FAMCO was hired in 1994. General Dynamics has continued to retain FAMCO based on its conclusion that FAMCO is providing excellent service to the Plans and that retaining FAMCO is prudent and in the best interest of plan participants. This conclusion was based on, among other factors, General Dynamics' regular monitoring and review of FAMCO's performance. For example, General Dynamics monitors FAMCO's performance through a variety of channels, including:

      a.      *Review of FAMCO's quarterly reports*:  Every quarter, FAMCO provides a written report discussing the performance of the Plans, including relative performance of the various investment funds offered within the Plans. Exhibit 74 is a true and correct copy of FAMCO's quarterly investment report for the period ending March 31, 2004, which I received on or about April 26, 2004. Every quarter, FAMCO distributes an investment report in substantially the same format as Exhibit 74, with updated and revised performance data and information. These reports provide General Dynamics an opportunity to review the performance of the funds and investment managers in the Plans and, therefore, FAMCO's performance in relation to those investment managers.

      b.      *IRC Meetings*:  Approximately three to four times a year, FAMCO meets with General Dynamics' IRC. The IRC meetings are typically attended by, among others:  the company's Chief Executive Officer; Chief Financial Officer; Treasurer; and Vice President, Human Capital Processes. At the IRC meetings, FAMCO reports on its performance and the

performance of the investment funds offered within the Plans.  FAMCO also previews the written PowerPoint presentation materials it will present to the BPIC.  These meetings provide General Dynamics' senior management with an opportunity to gauge FAMCO's performance relative to that of the other investment managers, and to ensure that FAMCO is providing the requisite quality of services.

8.      General Dynamics negotiated and executed a renewal of FAMCO's investment administration and management service agreement in 2004.  This agreement was negotiated at arms-length, and approved by senior management at General Dynamics.  Exhibit 75 is a true and correct copy of the October 8, 2004 agreement between General Dynamics and FAMCO, which I signed on behalf of General Dynamics.

Dodge & Cox

9.      General Dynamics hired Dodge & Cox in 2002 to manage certain assets in its pension plans.

10.      Before hiring Dodge & Cox, General Dynamics asked FAMCO to conduct a search for an investment manager in the "value" sector and to make a recommendation.  Exhibit 72 is a true and correct copy of the February 13, 2002 memorandum I received from Joseph Gallagher of FAMCO, which set forth the steps it followed and the bases for its recommendation of Dodge & Cox.

11.      After due consideration by senior management, General Dynamics decided to hire FAMCO to manage assets in its pension plans.  The Investment Management Agreement between General Dynamics and Dodge & Cox was executed effective March 11, 2002.  A true and correct copy of that agreement is attached as Exhibit 73.  Pursuant to this agreement, Dodge & Cox managed the pension plans' assets via a separately managed account platform -- meaning,

3

Dodge & Cox managed a separate account containing only General Dynamics' pension plan assets. The parties agreed to the following tiered fee schedule: 0.60% on the first $10 million; 0.40% on the next $15 million; 0.30% on the next $25 million; 0.25% on the next $50 million; and 0.20% thereafter. These break points remain in effect, and have never changed.

12.     In 2004, General Dynamics decided to investigate the possible addition of two new types of funds to its SSIP fund line-up: a large cap value fund and a large cap growth fund. General Dynamics asked FAMCO to help survey the marketplace and recommend specific investment managers for each type of fund.

13.     On July 15, 2005, FAMCO submitted a detailed recommendation memorandum. Exhibit 78 is a true and correct copy of FAMCO's July 15, 2005 memorandum to me and Henry Eickelberg at General Dynamics which I received on or about July 15, 2005. FAMCO submitted a revised memorandum on July 28, 2005. Exhibit 79 is a true and correct copy of FAMCO's revised July 28, 2005 memorandum to me and Henry Eickelberg at General Dynamics which I received on or about July 28, 2005.

14.     I independently reviewed and evaluated FAMCO's memorandum, and agreed with its recommendation to retain Dodge & Cox.

15.     In advance of the October 5, 2005 Benefit Plans and Investment Review Committee ("BPIC") meeting, FAMCO presented its recommendation as to Dodge & Cox to General Dynamics' investment review committee ("IRC"). I attended that meeting. The IRC was aware that Dodge & Cox, pursuant to its usual and customary practice, would count funds invested by the SSIP with Dodge & Cox as part of the total funds under management for purposes of the tiered fee schedule relating to the pension plans' investment with Dodge & Cox. This incidental benefit would have no impact on the fees charged to SSIP investors in the Dodge

& Cox mutual fund.  The IRC agreed with FAMCO's recommendation, and agreed that it should

be presented to the BPIC for its consideration.  The IRC did not rely upon the incidental benefit

the pension plans might receive via its tiered fee schedule in reaching its decision.

16.     In December 2005, the agreement between General Dynamics and Dodge & Cox

was amended to state that any funds invested by the Plans in the Dodge & Cox mutual fund

would be included as part of the pension plans' tiered fee schedule.  The break points remained

unchanged.  Exhibit 80 is a true and correct copy of the amended fee schedule agreement

between General Dynamics and Dodge & Cox, which I signed on behalf of General Dynamics

on or about December 31, 2005.

Monitoring Fees and Returns

17.     General Dynamics monitors the returns (after fees) and the costs and expenses

associated with the Plans on a regular basis.  For example:

a.     *Quarterly investment reports*:  FAMCO submits quarterly written

investment reports which identify the returns (net of fees) for each of the investment funds

offered within the Plans.  That performance data is then compared against the funds' respective

benchmarks over various periods.  These reports also contain information regarding the

estimated annual fees associated with each fund, reported in both dollars and basis points.

Exhibit 74 is a true and correct copy of FAMCO's quarterly investment report for the period

ending March 31, 2004, which I received on or about April 26, 2004.  Every quarter, FAMCO

distributes an investment report in a similar format as Exhibit 74, with updated and revised

performance data and information.

b.     *IRC Meetings*:  At the IRC meetings, which occur three to four times each

year in advance of the BPIC meetings, the committee is regularly updated by FAMCO on the

performance (net of fees) of the investment options offered within the Plans.  As to each investment fund, FAMCO reports on its performance over numerous periods, including year to date and the annualized returns over various periods.  FAMCO then compares each fund's performance (net of fees) over these periods against that of its respective benchmark.  This information is presented using a color-coded reporting methodology (green, yellow, red), whereby an investment fund is highlighted in color where their performance is not consistent with their benchmark or fund objective.  Funds which are flagged yellow or red receive heightened consideration and discussion at the IRC meetings.

18.     Because of its regular monitoring and oversight, General Dynamics is able to promptly identify any performance issues and make changes as necessary in the investment manager lineup.

Securities Lending

19.     I am knowledgeable regarding securities lending and have been familiar with securities lending programs since the early 1980's.

20.     I am familiar with the securities lending program offered by The Northern Trust, because General Dynamics' pension plans have been participating in its securities lending program since the 1990s.

21.     Prior to July 2000, General Dynamics' plan documents did not expressly permit securities lending within the Plans as to the securities owned by the Plans within its separately managed accounts.

22.     In 2000, General Dynamics re-visited whether to permit securities lending.  As part of the consideration of whether the Plans should participate in a securities lending program, I reviewed a January 2000 "white paper" prepared by FAMCO which discussed the risks and

6

rewards associated with securities lending. Exhibit 71 is a true and correct copy of the January 31, 2000 memorandum from Joseph Gallagher of FAMCO to me, which I received on or about January 31, 2000. Among other topics, this memorandum addressed the counterparty default, operational and collateral investment risks. General Dynamics was aware of and considered these risks as it decided whether to permit securities lending within the Plans.

23.     In June 2000, General Dynamics amended its Master Trust Agreement to expressly permit securities lending. A true and correct copy of the Master Trust Agreement, including the June 2000 Third Amendment thereto which I signed on behalf of General Dynamics, is attached as Exhibit 32.

24.     Following discussions with The Northern Trust regarding participating in its securities lending program, General Dynamics executed a securities lending agreement with The Northern Trust. Exhibit 59 is a true and correct copy of the Securities Lending Agreement between General Dynamics and The Northern Trust, which I signed on behalf of General Dynamics. That agreement provided for a 70/30 split of the income obtained through securities lending, with the Plans receiving 70% of the income and The Northern trust receiving 30% of the income.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of December, 2007.

David Fogg

Document No. 1608481

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC WILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 06-698-GPM |
| v. | ) | |
| | ) | Judge G. Patrick Murphy |
| GENERAL DYNAMICS CORPORATION, | ) | |
| | ) | Mag. Judge Clifford J. Proud |
| Defendant. | ) | |

## DECLARATION OF CHARLES GOODMAN

I, Charles Goodman, declare as follows:

1.      I am a Director of General Dynamics Corporation and a member of the General Dynamics' Board of Directors.  I have been a Director and member of the Board since 1991.

2.      Among other Board committees, I serve on the Benefit Plans and Investment Committee ("BPIC").  I am the chairman of the BPIC, and have served in this position since 1991.

3.      The purpose of the BPIC, as set forth in its corporate charter, is to review and monitor the investment, safekeeping and performance of the assets of all employee benefit plans of General Dynamics, including its 401(k) plans.  A true and correct copy of the Charter for the BPIC is attached as Exhibit 34.

Background

4.      I am Vice Chairman of Henry Crown and Company.  I have held this position since 2002.  From 1973 to 2002, I served as Vice President of Henry Crown and Company.

5.      A summary of my biographical data is attached hereto, which sets forth my education, employment, business affiliations, civic and charitable activities, board positions and awards.

FAMCO

6.      In 1994, General Dynamics decided to retain FAMCO to provide certain services for the company's 401(k) plans ("the Plans" or "the SSIP") and General Dynamics' defined benefit plans.  Prior to that time, certain of the functions performed by FAMCO were performed by General Dynamics' Trust Investment Operations ("TIO") in-house department.

7.      General Dynamics' decision to outsource this function to FAMCO in 1994 was the result of deliberations and discussions among officials at General Dynamics.  These discussions occurred in the context of General Dynamics experiencing a period of downsizing and uncertainty about its future.  Among other benefits, General Dynamics believed that outsourcing the TIO group would ensure that the company's plan participants would continue to benefit from the continuity and institutional knowledge possessed by the TIO employees.  General Dynamics believed that retaining FAMCO was prudent and in the best interests of SSIP participants.

8.      General Dynamics considered the idea of outsourcing to FAMCO in the context of its intimate knowledge of the services provided by Charles Walbrandt, who had worked in the company's internal investment management department since 1974, and his excellent track record as an investment manager.  General Dynamics was also familiar with the qualifications of and services provided by Joe Gallagher and other individuals who had worked in the TIO group for many years.

9.      The decision to retain FAMCO as a service provider to the SSIP was initially recommended and approved at a BPIC meeting on June 1, 1994.  In advance of this meeting, BPIC members were informed that the possible retention of FAMCO was an issue to be discussed at the meeting.  [See Ex. 35.]

10.     At the June 1 BPIC meeting, the BPIC reviewed a presentation detailing the investment management and administrative services to be provided to General Dynamics' employee benefit plans and the fees to be charged for these services by FAMCO.  [See Ex. 39.] The committee also considered the relative costs to be charged by FAMCO versus the industry averages for providing similar services.  The committee discussed and approved the outsourcing proposal, subject to further review of the definitive terms and conditions to govern the relationship between General Dynamics and FAMCO.  [See Ex. 41.]

11.     The BPIC's decision with respect to FAMCO was reported to the General Dynamics Board of Directors at its June 1, 1994 meeting.  [See Exs. 45, 49.]

12.     On August 3, 1994, the BPIC again met to discuss the outsourcing of the TIO group.  In advance of this meeting, BPIC members were informed that the proposed contract with FAMCO was an issue to be discussed at the meeting.  [See Ex. 36.]

13.     At the August 1994 BPIC meeting, the committee reviewed and discussed the proposed agreement between General Dynamics and FAMCO.  [See Ex. 42.]  After discussion, on motion made and seconded, the BPIC unanimously approving the outsourcing of the TIO operations to FAMCO.  The committee also authorized two company officers to execute the necessary contract documents with FAMCO.

14.     The BPIC's decision with respect to FAMCO was reported to the General Dynamics Board of Directors at its August 3, 1994 meeting.  [See Exs. 46, 50.]

15.     At the time it retained FAMCO, General Dynamics believed that FAMCO was a company which could offer unique institutional knowledge regarding the General Dynamics' 401(k) plans and its defined benefit plans.

16.     On October 6, 2004, the BPIC met to discuss a revised agreement with FAMCO. In advance of this meeting, BPIC members were informed that the renewal of FAMCO's contract was an issue to be discussed at the meeting.  [See Ex. 37.]

17.     At the October 6, 2004 BPIC meeting, the committee, after discussion, approved the draft agreement and authorized designated company officers to execute the agreement.  [See Ex. 43.]

18.     The BPIC reported this decision to the General Dynamics Board of Directors at its October 6, 2004 meeting.  [See Exs. 47, 51.]

19.     General Dynamics' decision to continue retaining FAMCO since 1994 was based on General Dynamics' belief that FAMCO was providing excellent service to the Plans and that retaining FAMCO was prudent and in the best interest of plan participants.  This conclusion was based on, among other factors, General Dynamics' regular monitoring and review of FAMCO's performance.  For example, General Dynamics monitors FAMCO's performance through a variety of channels, including:

a.     *Review of FAMCO's quarterly reports*:  Every quarter, FAMCO provides a written report discussing the performance of the Plans, including relative performance of the various investment funds offered within the Plans.  [See, e.g., Ex. 74.]  Each report provided General Dynamics an opportunity to review the performance of the funds and investment managers in the Plans and, therefore, FAMCO's performance in relation to those investment managers.

b.     *BPIC Meetings*:  Approximately three to four times a year, FAMCO travels to General Dynamics offices to meet with General Dynamics' BPIC.  At these meetings, FAMCO reports on its performance as investment manager and the performance of the other

investment managers providing services to the Plans.  FAMCO also presents written PowerPoint presentation materials, which discuss the performance of the Plans.  [See, e.g., Ex. 40.]  These meetings provide BPIC members and other members of senior management with an opportunity to gauge FAMCO's performance relative to that of the other investment managers, and to ensure that FAMCO is providing the requisite quality of services.

        c.    *BPIC Reports to General Dynamics Board*:  After the BPIC meetings, I submit a written report to the General Dynamics Board of Directors as to the status and performance of the plans, including the performance of each of the investment funds.  [See, e.g., Ex. 48.]

Dodge & Cox

      20.    On October 5, 2005, the BPIC met to discuss which investment manager to hire to manage what the Plans called the Large Cap Value Fund.  In advance of this meeting, BPIC members were informed that the potential hiring of Dodge & Cox was an issue to be discussed at the meeting.  [See Ex. 38.]

      21.    At the meeting, FAMCO reviewed the criteria it used in searching for managers, including:  relative performance, assets under management, and consistency of style.  [See Exs. 40, 44.]  The BPIC also considered the fees associated with investing in its Dodge & Cox Stock Fund, a registered mutual fund (DODGX).  (Dodge & Cox has previously closed its separately managed account platform, so that was not an option for the Plans.)

      22.    The committee then discussed whether to hire Dodge & Cox.  General Dynamics -- which at the time was investing assets in its pension plans with Dodge & Cox, and was very knowledgeable with its performance -- believed that retaining Dodge & Cox to manage the Large Cap Value Fund was prudent and in the best interests of SSIP plan participants.  For example,

5

the BPIC considered that during the period it had been managing funds within the company's pension plans, that Dodge & Cox's performance (11.5% average annual return) significantly exceeded both its benchmark (6.4% annual average return) and the S&P 500 (3.8% annual average return).  The BPIC, thus, was very satisfied with Dodge & Cox's relative performance, during both bear and bull markets.

23.   As part of its discussion, the BPIC was aware that Dodge & Cox, pursuant to its usual and customary practice, would count funds invested by the SSIP with Dodge & Cox as part of the total funds under management for purposes of the tiered fee schedule relating the pension plans' investments with Dodge & Cox.  This incidental benefit would have no impact on the fees charged to SSIP investors in the Dodge & Cox mutual fund (who, by law, pay the same investment manager fee as all other investors).

24.   FAMCO made clear in its presentation that this incidental benefit was not considered in its recommendation.

25.   In its discussions, the BPIC acknowledged that it understood the tiered pension plan fee schedule, but determined that it would not rely upon that fee arrangement in making its decision regarding the addition of the Dodge & Cox Stock Fund to the Plans.

26.   As a result of its discussions, the BPIC concluded that retaining Dodge & Cox (via its Dodge & Cox Stock Fund mutual fund) to manage the Large Cap Value Fund was prudent and in the best interests of plan participants.  Thus, on motion seconded and carried, the BPIC voted unanimously to add the Dodge & Cox mutual fund to the Plans investment line-up, effective on or about January 1, 2006.

27.   The BPIC's decision to retain Dodge & Cox was reported to and accepted by General Dynamics' Board of Directors at their meeting on October 5, 2005.  [See Exs. 48, 52.]

6

As part of its report, the BPIC advised the General Dynamics Board as to the inadvertent and incidental benefit relating to the defined benefit plans' tiered fee schedule. It further reviewed the selection process the company followed in making its decision to retain Dodge & Cox.

Monitoring Fees and Returns

28.     General Dynamics monitors the returns (after fees) and the costs and expenses associated with the Plans on a regular basis. For example:

a.      *Quarterly Investment Reports*: FAMCO submits quarterly written investment reports to General Dynamics which identify the returns (net of fees) for each of the investment funds offered within the Plans. That performance data is then compared against the funds' respective benchmarks over various periods. These reports also contain information regarding the estimated annual fees associated with each fund. This fee information, as to each investment fund, is reported in both dollars and basis points. [See, e.g., Ex. 74.]

b.      *BPIC Meetings*: At the BPIC meetings, which occur three to four times each year, the committee is regularly updated by FAMCO on the performance (net of fees) of the investment options offered within the Plans. As to each investment fund, the BPIC monitors its performance over various periods, including year to date and annualized returns over various periods. The BPIC then compares each fund's performance (net of fees) over these periods against that of its respective benchmark. Over the years, the BPIC has developed a color-coded reporting methodology (green, yellow, red) to better monitor each fund's performance. In particular, at each meeting, an investment fund is highlighted in yellow or red if their performance is not consistent with their benchmark, fund objective or investment guidelines. Funds which are flagged yellow or red receive heightened consideration and discussion at the BPIC meetings. [See, e.g., Ex. 40.]

7

       c.     <u>*BPIC Reports to General Dynamics Board*</u>:  After the BPIC meetings, I submit a written report to the General Dynamics Board of Directors as to the status and performance of the plans, including the performance of each of the investment funds.  [<u>See, e.g.</u>, Ex. 48.]

      29.    Because of this regular oversight, the company is able to promptly identify any performance issues and make changes as necessary in the investment manager lineup.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.  Executed this *14* day of December, 2007.

_____

Charles Goodman

Document No. 1605837

## BIOGRAPHIC DATA

### Charles H. Goodman

| | | |
|---|---|---|
| **EDUCATION** | Massachusetts Institute of Technology, Graduated 1954 | |
| **EMPLOYMENT** | Material Service Corporation | 1954 - 1967 |
| | Henry Crown and Company | 1967 - Present |

### BUSINESS AFFILIATIONS

| | | |
|---|---|---|
| Chicago, IL | Merchandise National Bank<br>Board Member | 1978 - 1987 |
| Chicago IL | Columbia National Bank<br>Board Member | - 1978 |
| Ashdod, Israel | Sunfrost Foods<br>Chairman of the Board | 1970 - 1990 |
| Little Rock, AR | ALLTEL<br>Board Member | 1998 - 2004 |
| Falls Church, VA | General Dynamics<br>Board Member | 1991 - Present |

### CIVIC AND CHARITABLE ACTIVITIES

| | | |
|---|---|---|
| New York, NY | UNITED JEWISH COMMUNITIES<br>(formerly Council of Jewish Federations)<br>Board Member<br>Treasurer<br>Vice President<br>President | <br><br>- Present<br><br>1990 - 1993<br> |
| Chicago, IL | JEWISH FEDERATION OF METROPOLITAN CHICAGO<br>Board Member<br>Treasurer<br>Vice President<br>President | <br>- Present<br><br><br>1984 - 1985 |

| | | |
|---|---|---|
| Chicago, IL | JEWISH UNITED FUND | |
| | Board Member | - Present |
| | General Chairman | 1983 |
| | | |
| Jerusalem, Israel | JEWISH AGEANCY FOR ISRAEL | |
| | Board of Governors | 1989 - Present |
| | Chairman/Board of Governors | 1995 - 1999 |
| | | |
| New York, NY | UNITED JEWISH APPEAL | |
| | Board Member | 1987 - Present |
| | | |
| Waltham, MA | BRANDEIS UNIVERSITY | |
| | Trustee | 1978 - Present |
| | | |
| Chicago, IL | FRANCIS W. PARKER SCHOOL | |
| | Board Member (Life) | |
| | President | 1976 - 1979 |
| | | |
| New York, NY | JDC | |
| | Director | 1990 - Present |
| | | |
| Chicago, IL | SCHWAB REHAB HOSPITAL | |
| | Director | 1976 - 1979 |
| | Vice President | |
| | | |
| Tel Aviv, Israel | TEL AVIV UNIVERSITY/RECONATI BUSINESS SCHOOL | |
| | Chairman/International Board | 2005 - 2006 |
| | | |
| Jerusalem, Israel | HEBREW UNIVERSITY | |
| | Governor/International Board | 2005 - Present |
| | Chairman/Board of Governors | 2006 - Present |

## MISCELLANEOUS BOARD POSITIONS

| | |
|---|---|
| Chicago, IL | Temple Shalom |
| Chicago, IL | Bryn Mawr Country Club |
| Chicago, IL | The Standard Club |
| Chicago, IL | Young Men's Jewish Council |

2

**AWARDS**

|  | Jewish Federation, Chicago, Young Leadership Award |
| 1972 | Jewish Federation, Chicago, Julius Rosenwald Memorial Award |
| 1993 | Jewish Federation, Chicago Distinguished Service Award |
| 2005 | The Hebrew University of Jerusalem, Doctor Philosophias |
| 2005 | Honoris Causa |

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

ERIC WILL, et al.,                              )
                                                )
      Plaintiffs,                          )
                                                )   **Case No. 06-698-GPM**
v.                                              )
                                                )   **Judge G. Patrick Murphy**
GENERAL DYNAMICS CORPORATION,                   )
                                                )   **Mag. Judge Clifford J. Proud**
      Defendant.                           )

## DECLARATION OF JOSEPH GALLAGHER

I, Joseph Gallagher, declare as follows:

1.      I am executive managing director of Fiduciary Asset Management, LLC.  I have been employed by Fiduciary Asset Management, LLC and its predecessor companies ("FAMCO") since 1994.  Prior to that time, I was employed by General Dynamics Corporation in its Trust Investment Operations department.  I worked at General Dynamics from 1980 until 1994, when I left to join FAMCO.

2.      In my position at FAMCO, I have responsibilities relating to General Dynamics' pension plans and 401(k) plans.  In connection with my work on the General Dynamics' account, I work closely with Charles Walbrandt, FAMCO's chief executive officer and chief investment officer.

3.      I have a B.S. from Pennsylvania State University, and an M.B.A. from the University of San Diego.

4.      I am a Chartered Financial Analyst ("CFA").

5.      I am a member of the St. Louis Chapter of the National Association for Business Economics.

6.      FAMCO is a service provider to the General Dynamics 401(k) plans, in addition to other General Dynamics employee benefit plans.  FAMCO is paid for its services to the Plans.

Dodge & Cox

7.      In 2002, FAMCO assisted General Dynamics in its search for a large cap value manager for General Dynamics' pension plans, which resulted in General Dynamics hiring Dodge & Cox.  Exhibit 72 is a true and correct copy of the February 13, 2002 memorandum I prepared and sent to David Fogg at General Dynamics recommending Dodge & Cox for General Dynamics' pension plans.

8.      In 2004, General Dynamics asked FAMCO to investigate and make a recommendation for a large cap value manager for General Dynamics' 401(k) plans.

9.      On July 15, 2005, FAMCO submitted a detailed recommendation memorandum.  Exhibit 78 is a true and correct copy of the July 15, 2005 memorandum I prepared and sent to David Fogg and Henry Eickelberg at General Dynamics.  A revised memorandum was submitted on July 28, 2005.  Exhibit 79 is a true and correct copy of the revised July 28, 2005 memorandum I prepared and sent to David Fogg and Henry Eickelberg at General Dynamics.

10.      In its memorandum, FAMCO identified the steps it followed in connection with its search for possible investment managers.  For example, FAMCO screened a database (the Mobius database) containing performance and portfolio data on more than 1,300 managers.  FAMCO also screened for managers that had successful long-term track records, high "style correlations" and an ability to perform well when their style was out of favor.  FAMCO further screened for managers with a large number of assets under management, a portfolio of liquid, large cap stocks, a reasonable fee rate and the ability to manage funds for 401(k) plans.

11.     FAMCO compared the performance of Dodge & Cox against seven (7) large cap value managers over 1, 3, 5 and 10-year periods, as well as the performance over those time periods of several indices, including the S&P 500 Index and Russell 1000 Value Index.  In addition to long-term performance, FAMCO also considered each manager's "style fidelity," including their ability to outperform during a period when its investing style (i.e., value) is both in favor and out of favor.  The other investment managers were:

- Legg Mason Capital Management
- TCW Group
- Harris Associates L.P.
- Oppenheimer Capital
- Armstrong Shaw Associates
- NWQ Investment Management Company, LLC
- PPM America, Inc.

12.     Among this group, Dodge & Cox was the second best performer over a five-year period (with an average annual return of 13.03%) and the top performer over a three-year period (with an average annual return of 11.25%).

13.     FAMCO recommended Dodge & Cox on the basis of its strong performance over these periods, plus its solid performance during the 2000-02 bear market (during which it had average annual returns of 2.07%).  During these various periods, Dodge & Cox significantly outperformed its benchmarks.  FAMCO's recommendation was also influenced by the fact that it now had first hand insight into Dodge & Cox's investment approach, as a result of its monitoring of General Dynamics' pension plans' investments with Dodge & Cox since 2002.  This first hand knowledge supported FAMCO's belief that Dodge & Cox could continue its excellent long-term performance record.

14.     In 2004, Dodge & Cox closed its separately managed account option.  Exhibit 76 is an August 30, 2004 e-mail announcement I received from Dodge & Cox.  FAMCO, thus,

recommended that General Dynamics invest in Dodge & Cox's mutual fund (the Dodge & Cox Stock Fund (DODGX)), which Dodge & Cox agreed to re-open for General Dynamics. FAMCO reported that Dodge & Cox would charge a net fee of approximately 45 basis points after ten (10) basis points of its estimated 55 basis point expense ratio (the same expenses applicable to all investors in its mutual fund) was rebated for the benefit of the Plans.

15.    Dodge & Cox's fee was in the middle of the range of fees charged by other large cap value managers, which was between approximately 25 and 75 basis points.

16.    As part of its memorandum, FAMCO further noted that any SSIP assets under management would be counted by Dodge & Cox in calculating the fees relating to General Dynamics' pension plans under the tiered fee schedule governing assets under management for the pension plans. This was Dodge & Cox's usual and customary practice, and how Dodge & Cox proposed the arrangement be handled. General Dynamics, thus, had two options regarding the treatment of the pension plans' tiered fee schedule: either Dodge & Cox could take the SSIP assets into account when calculating fees paid by the pension plans or Dodge & Cox could ignore SSIP assets invested in the mutual fund. Under either option proposed by Dodge & Cox, the fees to be charged to the SSIP were exactly the same. General Dynamics could not have secured a lower fee to obtain Dodge & Cox's services as investment manager for its SSIP assets.

17.    As part of its due diligence, FAMCO reviewed Dodge & Cox's Form ADV Part II. Exhibit 77 is a true and correct copy of a May 4, 2005 e-mail (w/ attachment) I received from Jane Larrow at Dodge & Cox, forwarding its then most recent Form ADV Part II.

18.    FAMCO presented its recommendation to the General Dynamics' Benefit Plans and Investment Committee ("BPIC") on October 5, 2005. Exhibit 40 is a true and correct copy of excerpts of the presentation materials FAMCO prepared and which Charles Walbrandt and I

presented at the October 5, 2005 BPIC meeting at General Dynamics.  In advance of the BPIC

meeting on October 5, FAMCO also presented its recommendation to General Dynamics'

investment review committee ("IRC").  The presentation materials used at the October 5, 2005

BPIC meeting were presented to the IRC.

Quarterly Investment Reports; IRC Meetings; BPIC Meetings

19.    Every quarter, under my direction, FAMCO prepares and sends to General

Dynamics a written investment report discussing the performance (net of fees) of various

investment funds offered within the Plans.  That performance data is then compared against the

funds' respective benchmarks over various periods, including:  year to date; calendar year returns

for the last few years; and annualized returns for various periods.  These quarterly reports also

contain information regarding the estimated annual fees associated with each fund.  This fee

information is reported in dollars and basis points.  Exhibit 74 is a true and correct copy of

FAMCO's quarterly investment report for the period ending March 31, 2004, which I prepared

and sent to General Dynamics on or about April 26, 2004.  Every quarter, FAMCO sends

General Dynamics an investment report in substantially the same format as Exhibit 74, with

updated and revised performance data and information.

20.    Three to four times a year, Charles Walbrandt and I travel to General Dynamics'

corporate offices in Falls Church, Virginia to meet with General Dynamics' Investment Review

Committee ("IRC").  At the IRC meetings, FAMCO reports on its performance as investment

manager and the performance of the other investment managers providing services to the Plans.

FAMCO also previews the written PowerPoint presentation materials it will present to the BPIC.

21.    Three to four times a year, Charles Walbrandt and I travel to General Dynamics'

corporate offices in Falls Church, Virginia to meet with General Dynamics' BPIC.  At these

meetings, FAMCO updates the BPIC on the performance (net of fees) of the investment options offered within the Plans. As to each investment fund, FAMCO reports the fund's returns (net of fees) over the following periods: year to date; and the annualized returns over various periods. FAMCO also compares each fund's performance (net of fees) over these periods against that of its respective benchmark. In making its presentation, at General Dynamics request, FAMCO presents this performance data using a color-coded reporting methodology (green, yellow, red). At each meeting, each investment fund's performance is highlighted in yellow or red if their performance is not consistent with their benchmark, fund objective or investment guidelines. Exhibit 40 is a true and correct copy of (excerpts of) FAMCO's presentation materials for the October 5, 2005 BPIC meeting. FAMCO prepares and presents materials in substantially the same format, with updated and revised performance data and information, at each meeting of the BPIC.

Miscellaneous

22. Since the Plans have been participating in The Northern Trust's securities lending program, it has always returned a positive net income to the Plans in any given year.

23. Exhibit 71 is a true and correct copy of a January 31, 2000 "white paper" letter I prepared and sent to David Fogg at General Dynamics on or about January 31, 2000 relating to securities lending.

24. Exhibit 72 is a true and correct copy of a February 13, 2002 memorandum I prepared and sent to David Fogg at General Dynamics, which accurately sets forth the steps I followed in making FAMCO's recommendation for a large cap value manager for General Dynamics' pension plans.

25.      Exhibit 73 is a true and correct copy of the March 11, 2002 investment

management agreement (as amended) between General Dynamics and Dodge & Cox, which I

signed on behalf of General Dynamics.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed this 17th day of December, 2007.


Joseph Gallagher

Document No. 1608479

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ERIC WILL, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) **Case No. 06-698-GPM** |
| v. | ) |
| | ) **Judge G. Patrick Murphy** |
| GENERAL DYNAMICS CORPORATION, | ) |
| | ) **Mag. Judge Clifford J. Proud** |
| Defendant. | ) |

<u>**DECLARATION OF MARGARET HOUSE**</u>

I, Margaret House, declare as follows:

1.     I am Assistant Corporate Secretary at General Dynamics Corporation.  I have been in this position since 1993.

2.     In my position, I am a custodian of records for the official records and materials relating to the meetings of the General Dynamics Board of Directors, and the General Dynamics Benefit Plans and Investment Committee ("BPIC").

3.     Exhibits 35-38 are true and correct copies of the notices sent to members of the BPIC as to the scheduled meetings of the BPIC on:  June 1, 1994; August 3, 1994; October 6, 2004; and October 5, 2005.

4.     Exhibits 39-40 are true and correct copies of (excerpts of) the presentation materials from the June 1, 1994 and October 5, 2005 meetings of the BPIC.

5.     Exhibits 41-44 are true and correct (redacted) copies of the minutes of the meetings of the BPIC on:  June 1, 1994; August 3, 1994; October 6, 2004; and October 5, 2005.

6.     Exhibits 45-48 are true and correct (redacted) copies of the written reports submitted by the BPIC to the General Dynamics Board of Directors regarding its meetings on June 1, 1994, August 3, 1994, October 6, 2004, and October 5, 2005.

7.     Exhibits 49-52 are true and correct (redacted) copies of the minutes of the meetings of the General Dynamics Board of Directors on:  June 1, 1994; August 3, 1994; October 6, 2004; and October 5, 2005.

8.     Exhibits 35-52 were made at or near the time of the indicated meetings by, or from information transmitted by, persons with knowledge;  are kept and maintained in the course of General Dynamics' regularly conducted business activities; and it has been the regular practice of General Dynamics to prepare or have prepared at its direction these materials.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this _17th_ day of December, 2007.


_Margaret House_

Margaret House


Document No. 1608470